NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0038n.06

No. 15-1832

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 18, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| HAPPY ASKER, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: BOGGS, SUHRHEINRICH, and McKEAGUE, Circuit Judges.

BOGGS, Circuit Judge. This appeal arises out of a criminal conviction for IRS fraud, filing false tax returns, and corruptly endeavoring to obstruct and impede the administration of the internal revenue laws, in violation of numerous federal statutes. *See* 18 U.S.C. § 371; 26 U.S.C. §§ 7206, 7212. The defendant, Happy Asker, challenges his conviction based on four errors allegedly committed by the trial court: 1) denial of his motion to suppress evidence obtained pursuant to a warranted wiretap; 2) denial of his motion to suppress evidence obtained pursuant to a warranted search; 3) denial of his request for a continuance to prepare for the government's introduction of non-disclosed evidence; and 4) granting the government's request for a proposed jury instruction of "deliberate ignorance." Because the district court committed no reversible error, we affirm.

I

A

Happy Asker founded the first Happy's Pizza location in 1996 in Detroit, Michigan. After experiencing financial success with his first location, he expanded to a second location in 1997. Additional locations soon followed and, by 2005, Asker had opened fifteen Happy's Pizza locations in the Detroit area. To accommodate the increased interest in his pizza business and to facilitate further expansion, Asker moved his business to a franchise model in 2007, and began fielding offers from potential franchisees. From 2007 to 2010, the number of Happy's Pizza locations tripled, and stores were operating in Michigan, Ohio, and Illinois. Asker owned the franchisor entity, Happy's Pizza Franchise, and retained an ownership interest in most of the franchise locations.

In 2009, the Drug Enforcement Administration ("DEA") received a credible tip that implicated several individuals associated with Happy's Pizza in a complicated scheme involving narcotics trafficking and money laundering. The anonymous informant, who had been working with DEA officials for eighteen months, relayed to agents a recent conversation that he'd had with Ramiz Gallozi, a known drug trafficker. Gallozi suggested that the informant, who had approached Gallozi to discuss laundering narcotics proceeds, invest his cash in a Happy's Pizza location. A subsequent trash pull at Happy's Pizza Headquarters revealed a list of fifty-four Happy's Pizza franchise locations, many of which were owned by suspected narcotics traffickers.

Based partially on this information, the government applied for an order under 18 U.S.C. § 2518, authorizing a wiretap for the cell phone of Arkan Summa, one of the suspected narcotics dealers mentioned on the list recovered at the trash pull. In the supporting affidavit, Agent

-2-

Benjamin Swincicki stated facts purporting to show probable cause that the wiretap would reveal communications indicative of narcotics and money-laundering offenses. Among other things, Swincicki's affidavit relied on several conversations between Summa and Gallozi that had been intercepted pursuant to a previous wiretap on Gallozi's phone. In these conversations, Summa and Gallozi discussed their attempts to obtain marijuana. In order to mask their illicit activities, the two spoke in a mixture of English and Chaldean,[1] frequently using the term "bisla" to refer to what Swincicki believed was an "amount of drugs" indicative of narcotics trafficking. Based on the information contained within Swincicki's affidavit, the district judge authorized the wiretap on June 11, 2010.

This wiretap provided government agents with additional information connecting Happy's Pizza to suspected narcotics trafficking. On August 19, 2010, the government incorporated this wiretap evidence in an application for a search warrant for Happy's Pizza corporate office. Agent Swincicki also provided the affidavit in support of probable cause for this warrant. Among other things, Swincicki's affidavit made specific reference to a June 16, 2010, conversation between Summa and Gallozi in which the monitoring agents believed the two to be discussing a deal for a half-pound of marijuana. The affidavit also recited many of the same facts mentioned in the June 11 wiretap application, as well as supplemental observations made during physical surveillance performed by other government agents. A magistrate judge approved the government's warrant request, and the search was executed on August 25, 2010. In the search, agents recovered many financial documents that implicated Happy's Pizza in a

---

[1] Chaldean is a Neo-Aramaic language spoken throughout a large region stretching from northwestern Iran to northern Iraq, along with parts of southeastern Turkey.

complex scheme to underreport earnings and wages, in which the surplus would be distributed to franchise owners in cash.[2]

B

Based on all of the evidence, a grand jury charged Happy Asker and several of his associates with various offenses related to the underreporting of Happy's Pizza stores' income and payroll. They include one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; multiple counts of filing false income tax returns, in violation of 26 U.S.C. § 7206; and multiple counts of corruptly endeavoring to obstruct the IRS's administration of the revenue laws, in violation of 26 U.S.C. § 7212. While Asker's co-defendants all pleaded guilty, Asker chose to proceed to trial.

Prior to trial, Asker filed several motions in the district court seeking to suppress evidence gathered pursuant to the June 2010 wiretap and the August 2010 search of Happy's Pizza headquarters office. In both motions, Asker argued that Agent Swincicki intentionally misrepresented surveillance records in order to portray Summa and Gallozi as narcotics traffickers. In fact, Asker maintained, the record plainly indicated that Summa and Gallozi were only engaged in the process of obtaining "*user's quantities* of marijuana," and that Swincicki knowingly exaggerated the magnitude of their drug transactions in order to obtain court approval for the government's searches.

Regarding the wiretap affidavit, Asker pointed to Summa's and Gallozi's use of the term "bisla" during their discussions about marijuana. Noting that the word, which is the Chaldean

---

[2] Happy's Pizza kept two sets of financial records in its corporate headquarters: "Dome Books" and sales reports. The dome books accurately reflected each store's actual receipts and expenditures, while the sales reports listed artificially reduced figures. On a weekly basis, franchise owners would meet at Happy's Pizza corporate headquarters to compare records and divide the difference in cash. *See* Appellee's Br. at 4–5.

term for "onion," is a commonly recognized euphemism for ounce, Asker argued that Swincicki intentionally described the term as a generic "quantity of marijuana" so as "to characterize the intercepted conversations as evidence of 'major' trafficking." Asker concluded that these misrepresentations were fatal to the required showings of both probable cause and necessity under the wiretapping statute, 18 U.S.C. § 2518, and that suppression of the evidence was the proper remedy.

To the extent that the warrant affidavit relied on evidence gathered through the allegedly improper wiretap, Asker argued that it too was fatally flawed. Moreover, Asker argued that Swincicki made additional misrepresentations in his warrant affidavit when he concluded that Summa's and Gallozi's use of the word "half" in a June 16, 2010 phone call referred to a "half pound of marijuana." Asker asserts that Swincicki knew that "half" referred to a smaller quantity, such as a half-ounce. It "*must* have been clear to the affiant," Asker opined, that the transactions referred to in the intercepted conversations "were clearly *not* designed to, nor capable of, generating the kind of proceeds that would lead to laundering." Asker maintained that these misrepresentations were fatal to the affidavit's showing of probable cause. In addition, Asker argued that the warrant constituted an improperly overbroad all-records search because it "effectively authorized the search for and seizure of all the records of all of the businesses . . . and individuals that were subject to the search." As the government had failed to make the "particularly extensive showings of probable cause" required to justify such an extensive search, Asker concluded that the warrant failed on those grounds as well.

With regard to Swincicki's alleged misrepresentations in both affidavits, Asker requested an evidentiary hearing in accordance with *Franks v. Delaware*, 438 U.S. 154 (1978), in order to determine whether or not Swincicki's statements were deliberately or recklessly false. While the

district court never made a determination as to whether or not a *Franks* hearing was warranted, the court nonetheless permitted the defendant to examine Swincicki on the record regarding his allegedly falsified affidavits in a hearing on June 3, 2014. With respect to the term "bisla," Swincicki testified that Summa and Gallozi used the term so broadly that he "was never able to determine if it was ounces they were talking about or just marijuana in general." Swincicki admitted, however, that as the investigation progressed, agents became aware that the word had a more specific meaning. Although he could not recall the exact date that this revelation occurred, DEA "line sheets"[3] suggested that another monitoring agent made the connection during a call on June 17, 2010—nearly a week *after* the government had successfully obtained authorization for the wiretap on Summa's phone, but a full month *before* the government applied for the warrant to search Happy's Pizza corporate office. Swincicki maintained that although he regularly reviewed the line sheets, he was not specifically made aware of this discovery before he swore out the search warrant affidavit.

Swincicki further testified that the context of Summa's and Gallozi's conversations led him to genuinely believe that the word "half" in the June 16, 2010 phone call was being used in reference to pounds, not ounces. Swincicki testified that he had personally observed Summa meet with individuals who were interested in purchasing some of Summa's marijuana. In those conversations, and in Summa's subsequent conversations with Gallozi, no reference was made to "bisla" or "onion" or any other limiting term. Swincicki testified that, in light of those conversations and the other evidence Swincicki had gathered over the course of his investigation, he believed that Summa and Gallozi were discussing pounds of marijuana in their intercepted conversations.

---

[3] "Line sheets" are regularly maintained call summaries of wiretap monitoring targets, prepared by DEA agents.

On the basis of Swincicki's testimony and the parties' arguments, the district court denied both of Asker's suppression motions in a hearing on October 23, 2014. Although the district judge indicated that a formal writing would later be filed on the record that fully explained the court's rationale, no filing was made. Thus, Judge Denise Hood's statement on the record is the only evidence we have of the district court's basis for its denial of Asker's suppression motions. Judge Hood did not expressly address her reasoning for the denial of Asker's motion to suppress the wiretap evidence, although she did conclude that "the electronic surveillance was supported by the evidence included in the affidavit" and that the inclusion of the wiretap evidence in the government's affidavit for the warrant to search Happy's Pizza corporate office was not "inappropriate." With respect to the office search warrant, Judge Hood examined the record and found that there was probable cause and that the warrant was not overbroad. Even if it was overbroad, Judge Hood continued, the good-faith exception to the exclusionary rule would apply. The officers who seized evidence "acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment," and nothing suggests that the issuing judge was intentionally or recklessly misled by the affiant.

C

When the case proceeded to trial, Asker raised two additional issues that are relevant to this appeal: 1) a motion for a continuance in order to examine evidence offered by the government that had not been disclosed before trial, and 2) an objection to the government's proposed jury instruction of "deliberate ignorance." The district court ruled against Asker on both issues.

Asker raised his continuance motion in response to the government's proposed Exhibit 597, which it had not announced until the fifth day of trial. The exhibit amounted to a computer

spreadsheet that had been recovered from one of the hard drives taken from a computer at Happy's Pizza corporate headquarters. It showed the weekly cash splits for several Happy's Pizza stores, including many locations that were not specifically identified in Asker's indictment. Asker requested a continuance of a day, arguing that he and his expert had not prepared to discuss information pertaining to the stores not mentioned in the indictment, and the judge took the matter under advisement. When court reconvened the next day, however, and the government formally moved Exhibit 597 into evidence, the district court denied Asker's motion and permitted immediate introduction of the evidence. Government witness Daniel Kozlowski, an investigator at the Department of Justice, referenced the document during his testimony, and it was also discussed during Asker's direct-examination testimony.

As trial neared its conclusion, the government submitted proposed jury instructions that included an instruction for "Deliberate Ignorance." The instruction, which was modeled after the Sixth Circuit Pattern Criminal Jury Instruction § 2.09, read as follows:

(1) Next, I want to explain something about proving a defendant's knowledge.

(2) No one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that the defendant deliberately ignored a high probability that the returns at issue that the defendant filed or aided or assisted in filing were false, then you may find that the defendant knew that they were false.

(3) But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that the claims were false, fictitious or fraudulent, and that the defendant deliberately closed his eyes to what was obvious. Carelessness, or negligence, or foolishness on his part is not the same as knowledge, and is not enough to convict. This, of course, is all for you to decide.

Asker objected to the giving of this instruction, arguing that the evidence in the record failed to satisfy the "factual predicate" necessary for the instruction to be given. Asker believed that the record reflected that his attention was focused elsewhere in the business during the perpetration of this tax fraud, not that he had "purposely contrived to avoid learning the truth." Nonetheless,

Asker conceded that Sixth Circuit law suggested that the giving of such an instruction even where the factual predicate has not been met can only amount to harmless error.

Judge Hood took Asker's objection under advisement, but ultimately gave the contested instruction to the jury. She, too, acknowledged that the giving of this instruction could only amount to harmless error in the Sixth Circuit, but further reasoned:

> [I]t can be given . . . when the Defendant claims lack of guilty knowledge or when the facts and evidence support an inference of deliberate ignorance[,] and there are some statements made during the course of the Government's proofs and by the Defendant that I think may raise a question about whether or not there was some inference of deliberate ignorance.
>
> I think it is also appropriate where the evidence establishes that the Defendant deliberately chose not to inform himself of critical facts[,] and the [c]ourt may find based on the Defendant's testimony that he didn't look to critical facts relative to the amount of his income and whether or not there was unreported gross receipts and underreporting of payroll paid by cash.
>
> In addition, I think whether the Government can prove willfulness or whether the Defendant's actions constitute deliberate ignorance are all for the jury to decide in this particular case.

Consequently, Judge Hood gave the proposed instruction to the jury. At the conclusion of the nine-day trial, and with this proposed instruction in hand, the jury convicted Asker on all counts. The district court sentenced him to fifty months of imprisonment, and he brings this appeal.

## II

Asker first argues that the district court erred when it denied his motion to suppress the evidence obtained pursuant to the government's authorized wiretap. The Sixth Circuit treats a decision on a motion to suppress wiretap evidence as a mixed question of law and fact, "review[ing] the district court's findings of fact for clear error and questions of law *de novo*." *United States v. Poulsen*, 655 F.3d 492, 503 (6th Cir. 2011). A factual finding amounts to clear

error "when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999).

A

Because "[s]tanding is the 'threshold question in every federal case,'" *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001) (quoting *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999)), we first consider the government's contention that Asker lacks standing to challenge most of the intercepted conversations in this dispute.

Electronic wiretap applications are governed by 18 U.S.C. § 2518, which provides that "[a]ny aggrieved person" may move to suppress any "unlawfully intercepted" communication in a hearing before a court of law. *Id.* § 2518(10)(a). The statute further defines "aggrieved person" as one "who was a *party* to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." *Id.* § 2510(11) (emphasis added). As the government notes, Asker was a "party" only with respect to one conversation that the government introduced at trial: a June 23, 2010 phone call between Summa and Asker in which the two agreed to meet at Happy's Pizza corporate office. In every other conversation that Asker seeks to suppress, he was not a party. Nor was he a "person against whom the interception was directed." 18 U.S.C. § 2510(11). Summa's phone was the subject of the contested search, and the government's wiretap application listed eight "Target Subjects" for monitoring, none of whom were Asker. Stated more plainly, wiretap searches are subject to the same "established principle" that governs alleged Fourth Amendment violations: "suppression of the product of a [violative search] can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence."

*United States v. Cooper*, 868 F.2d 1505, 1509 (6th Cir. 1989) (quoting *Alderman v. United States*, 394 U.S. 165, 171–72 (1969)). As such, the government argues, Asker has standing "only with reference to the interceptions of the telephone conversations . . . in which [Asker] participated." *Id.* at 1510.

Asker encourages us to engage in a broader reading of the statute's definitional provision. Emphasizing that "'aggrieved' person means a person who was a party to *any* intercepted wire," Appellant's Reply Br. at 2 (quoting 18 U.S.C. § 2510(11)), Asker suggests that the statute entitles him to challenge the interceptions as a whole, regardless of whether or not he was a participant in the specific conversation he seeks to suppress. In advancing this argument, Asker attempts to portray the language in *Cooper* as dicta, noting that the defendant in that case *only* sought to challenge the intercepted telephone conversations to which he was a party. Asker's argument misreads our precedent, however. While the defendant in that case did only seek to challenge those conversations, he attempted to do so on the basis of alleged violations against "each separate putative participant" of the intercepted communications, whether or not they were actively engaged in a conversation with the defendant. *Cooper*, 868 F.2d at 1509 (internal quotation omitted). The principle undergirding that "pervasive argument" that the court rejected in *Cooper* is the same that Asker seeks to invoke here—that a defendant can obtain relief based upon the alleged legal injuries of others. *Ibid.* That he simply cannot do.

Asker nonetheless has standing to challenge the one conversation in which he was a participant that was admitted at trial. In that regard, he advances two arguments on appeal: 1) that the probable-cause showing of the affidavit was fatally flawed by the alleged misrepresentations of Agent Swincicki, and 2) that the showing of necessity required by

18 U.S.C. § 2518(3)(c) was similarly flawed by the same alleged misrepresentations. Neither argument has merit.

B

18 U.S.C. § 2518 requires that a judge find probable cause before granting the government's request for a wiretap. This includes both probable cause that the targeted individual is committing, has committed, or is about to commit a particular enumerated offense, and that the proposed wiretap will intercept communications concerning that offense. *Id.* § 2518(3)(a)–(b). Probable cause means the same in the federal wiretapping statute as it does in the context of an ordinary search warrant. *See United States v. Alfano*, 838 F.2d 158, 161–62 (6th Cir. 1988). Determining whether probable cause exists is not an exact science, and judges are instructed to look at the "totality of the circumstances and in a reasonable and common sense manner . . . . [T]he exact quantum of support required has frequently been described as a fair probability, but more than a mere suspicion, that such evidence will be discovered." *Id.* at 162 (internal quotations omitted). As such, we ordinarily "accord[] 'great deference' to a magistrate's determination," *United States v. Leon*, 468 U.S. 897, 914 (1984) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)), and we will not reverse his decision "if the record contains a 'substantial basis for his probable cause findings.'" *Alfano*, 838 F.2d at 162 (quoting *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985)).

The defendant who attacks a judge's determination of probable cause by "challeng[ing] the veracity of statements made in [the] affidavit that formed the basis for [the] warrant has a heavy burden." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). He must make "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks v. Delaware*, 438 U.S. 154, 171 (1978).

Mere "[a]llegations of negligence or innocent mistake are insufficient." *Ibid.* This burden is even greater where, as here, the defendant alleges that the affiant intentionally omitted material information from the affidavit. "[A]ffidavits with potentially material omissions, while not immune from *Franks* inquiry, are much less likely to merit [potential suppression] than are affidavits including allegedly false statements." *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998). To be successful on these grounds, the defendant must make a "strong preliminary showing that the affiant, *with an intention to mislead* excluded critical information from the affidavit." *Id.* at 816. Even where the defendant meets this heightened standard, the warrant may still stand if "absent the challenged statements, there remains sufficient content in the affidavit to support a finding of probable cause." *Bennett*, 905 F.2d at 934 (citing *Franks*, 438 U.S. at 171). If the defendant can successfully make this additional showing, however, the evidence should be suppressed. *Ibid.*

In this case, our inquiry is made more difficult by the failure of the district judge to make a fully detailed finding on the record when she denied Asker's wiretap suppression motion. The only language this court has to review on appeal is the district judge's finding that "the electronic surveillance was supported by the evidence included in the affidavit." When factual issues are integral to a ruling on a pretrial motion, the district court "must state its essential findings on the record." Fed. R. Crim. P. 12(d); *United States v. Thomas*, --- F. App'x ---, 2016 WL 6427287 at *7 (6th Cir. Oct. 31, 2016) (citing *United States v. Moore*, 936 F.2d 287, 288 (6th Cir. 1991) (remanding for reconsideration where a court had made a suppression decision only by "margin entry")). A failure to comply with this requirement will generally be deemed an abuse of discretion. *Id.* However, even in the absence of explicit findings, the ruling may be upheld "if the reason for the district court's denial is apparent on the face of the record." *United States v.*

*Mitchum*, 208 F.3d 216 (Table), 2000 WL 222578 at *3 (6th Cir. Feb. 16, 2000). In *Mitchum*, the district court denied a suppression motion challenging the validity of a search warrant and supporting affidavit. On appeal, the district court's failure to make explicit findings was deemed not to frustrate meaningful review because the reviewing court could ascertain from the face of the supporting affidavit that it was neither false nor overbroad. *Ibid.*

Here, too, the record provides the necessary support to uphold the district court's conclusion. The district court's determination that the affidavit is free of recklessly false statements is a finding of fact subject to the clear-error standard. *See United States v. Rice*, 478 F.3d 704, 709 (6th Cir. 2007) (citing *Bennett*, 905 F.2d at 934). Upon review of the record, there is nothing that leaves us with the "definite and firm conviction that a mistake has been committed." *Navarro-Camacho*, 186 F.3d at 705. As an initial matter, the statements that Asker contests in Swincicki's affidavit are factually true—the term "bisla" actually *did* refer to an "amount of drugs." Even if we were to conclude that such a generic reference constitutes a material omission because the surveillance targets were dealing in a more precise amount, nothing in the record suggests that Asker made the "very rare . . . strong preliminary showing that" Swincicki made that omission with the intent to mislead the authorizing magistrate. *See Mays*, 134 F.3d at 816. Swincicki did not "admit[] that the statements in his affidavit were untrue," *Bennett*, 905 F.2d at 934, nor did his testimony give rise to an inference of intentional deception. At best, Swincicki's conduct during the investigation amounts to the kind of "negligence or innocent mistake" that *Franks* was never intended to remedy. *Franks*, 438 U.S. at 171.

Notwithstanding ambiguity in the definition of "bisla," the affidavit contains abundant information pertaining to narcotics crimes. Appellant's brief practically concedes this point,

noting that "[o]n its face, the affidavit certainly raises the specter of drug trafficking activity of a sort which might implicate financial crimes as well." Appellant's Br. at 23. The affidavit refers to over 190 intercepted conversations between Summa and Gallozi, approximately 20 of which involved "buying and selling marijuana or business information." The remaining conversations involved smoking marijuana. The two also frequently discussed obtaining marijuana, including the various sources from which it could be obtained. In addition, the affidavit contains information from a confidential informant ("CS-1") who indicated that Gallozi's income came from selling marijuana. This is sufficient for a finding of probable cause. *See United States v. Moore*, 661 F.3d 309, 312–13 (6th Cir. 2011) (finding probable cause where a confidential informant reported only seeing "drugs of an unspecified quantity"); *United States v. Fowler*, 535 F.3d 408, 414 (6th Cir. 2008) (finding probable cause where a confidential informant reported that the defendant was "selling and using" drugs and had seen a bag of drugs in the defendant's car); *Alfano*, 838 F.2d at 162 (finding probable cause where there was a "recurring pattern" of phone calls between suspected conspirators that "involved a drug-related code"). The affidavit also included extensive details about the surveillance targets' prior drug offenses. Although not dispositive, they further support a finding of probable cause. *See United States v. Martin*, 526 F.3d 926, 937 (6th Cir. 2008).

The affidavit also contains substantial information relating to the money-laundering allegations. CS-1 reported conversations with Gallozi where the two discussed how the informant could invest drug money in a Happy's Pizza location. Another informant ("CS-2") reported conversations with a Happy's Pizza manager, where the manager told the informant that "[Asker] only lets narcotics traffickers and other lawbreakers open a [Happy's Pizza]." This informant also believed, based on conversations with other individuals associated with Happy's

Pizza, that Summa was the point of contact for investors interested in opening their own store. Both informants, according to Swincicki's affidavit, had track records of providing truthful information that had been successfully corroborated by law enforcement. And the informants' tips had been corroborated by additional police investigation, such as the contact list recovered during the trash pull of Happy's Pizza corporate office. This, too, supports a finding of probable cause. *See Moore*, 661 F.3d at 313 (finding probable cause based on information from a confidential informant whose reliability and basis for knowledge was provided); *United States v. Gunter*, 551 F.3d 472, 480 (6th Cir. 2009) (finding probable cause based on information from a reliable informant that had been corroborated by police).

For these reasons, we hold that the district court was correct in concluding that the wiretap was supported by sufficient probable cause, as required by 18 U.S.C. § 2518.

C

18 U.S.C. § 2518 also requires that the government show necessity for the wiretap by giving "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(1)(c). This provision was included in the statute in order "to guarantee that wiretapping or bugging occurs only when there is a genuine need for it and only to the extent that it is needed." *Dalia v. United States*, 441 U.S. 238, 250 (1979). Further, the provision "protects against the impermissible use of a wiretap as the 'initial step in [a] criminal investigation.'" *Rice*, 478 F.3d at 710 (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)). The necessity requirement does not require the government to exhaust every investigative tool, however. It does not require the government "to prove that every other conceivable method has been tried and failed." *Alfano*, 838 F.2d at 163.

Asker claims that this requirement was not satisfied because the government's preliminary investigations, based on two months of monitoring Gallozi's calls pursuant to a separate wiretap, revealed "just some young people getting high, and no need whatsoever for the kind of grossly invasive intrusion which wiretapping presents." Appellant's Br. at 25. Stated differently, Asker attacks the government's showing of necessity on the same ground that he attacks the showing of probable cause—that the government had intentionally misrepresented the scope of Summa's and Gallozi's dealings, and that a truthful representation of their conduct would not permit the government to satisfy the requirements of the statute. As Asker puts it, "Surely, . . . an Article III judge . . . would have thought twice about the necessity of employing electronic surveillance to investigate the activities of Harold and Kumar – and, on reflection, declined the invitation to do so." *Ibid.*

As the government points out, however, this argument fundamentally misunderstands the meaning of the necessity requirement. The quantity of drugs Summa and Gallozi were purportedly dealing had no bearing on whether or not "the investigators g[a]ve serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court [was] informed of the reasons for the investigators' belief that such non-wiretap techniques [were] inadequate." *Rice*, 478 F.3d at 710 (quoting *Alfano*, 838 F.2d at 163–64). The necessity requirement is designed to ensure that wiretaps are not routinely used where "traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). In other words, the necessity requirement is not concerned with the investigators' belief about the underlying substance of the alleged crime. That inquiry is addressed by the requirement for probable cause. Rather, necessity is concerned with the investigative procedures employed by the government prior to the application for a wiretap.

In this case, the record reflects that the government employed numerous alternative investigative techniques before resorting to this wiretap application. These included 1) the interception of prior communications from Gallozi's phone; 2) the execution of search warrants to obtain GPS location information for Summa's phone; 3) obtaining toll records for Summa's phone; 4) consulting with confidential informants; and 5) attempted physical surveillance. These techniques provided the investigating agents with some information about the Target Subjects' alleged criminal activity, but were ultimately insufficient to reveal the full scope of their operation. The affidavit also set out the various non-wiretap techniques that investigators considered, but deemed not likely to succeed, including 1) the use of closed-circuit-television surveillance; 2) collection of Target Subjects' trash; 3) attempting to gain the cooperation of the Target Subjects; 4) convening a Federal Grand Jury for investigation; and 5) the use of an undercover agent. Our case law suggests that explication of these steps was sufficient to demonstrate that the government had met the statutory necessity requirements. *See Poulsen*, 655 F.3d at 504 (finding the necessity requirement satisfied where the government had "used a confidential informant, consensual recordings, a pen register, physical surveillance, and documents before resorting to the wiretap.").

D

In any event, even if we were to find that the wiretap evidence should have been suppressed by the district court, it almost certainly amounts to harmless error. *See United States v. Glover*, 681 F.3d 411, 421 (D.C. Cir. 2012). Since Asker only has standing to challenge the lone intercepted conversation in which he participated that was admitted at trial, *see supra* Part I.A, there cannot be a reasonable doubt that the admission of that single call did not affect the

jury's verdict. *Cf. United States v. Garcia*, 496 F.3d 495, 506 (6th Cir. 2007) (applying the "harmless beyond a reasonable doubt" test to an alleged violation of the Fourth Amendment).

Asker's June 23, 2010 conversation, which took place between him and Summa, lasted only 53 seconds and concerned their plan to meet in Asker's office later in the day. It was only relevant to the government's charge that Asker had corruptly endeavored to obstruct the IRS by concealing Summa's involvement in Happy's Pizza. At trial, its probative value was limited to demonstrating that Asker lied when he told IRS investigators that Summa had "no involvement" with Happy's Pizza and that the two "never" spoke. The government introduced extensive additional evidence on this point, including other intercepted calls, call logs demonstrating Asker's frequent calls with Summa, as well as a corporate contact list that indicated Summa was the lead contact for one store. In the context of this evidentiary backdrop, the admission of the contested June 23 wiretap conversation cannot be deemed to rise above the level of harmless error. For these reasons, we affirm the district court's decision to admit evidence gathered pursuant to the challenged wiretap.

### III

Asker also challenges the district court's ruling on a motion to suppress evidence obtained pursuant to a search warrant of Happy's Pizza corporate offices. As a motion to suppress is a mixed question of law and fact, "we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Ellis*, 497 F.3d 606, 611 (6th Cir. 2007). A factual finding amounts to clear error "when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Navarro-Camacho*, 186 F.3d at 705.

A

Asker advances one argument on this point that can be dismissed based on the analysis given above: that the affidavit showing probable cause was "fatally flawed" by the inclusion of information obtained through the wiretap he challenged in his first suppression motion. *See supra* Part II. Because it is clear that the challenged wiretap was legal and proper, it bears no impermissible fruits that taint the affidavit supporting this warrant search.

Even if we were to conclude that the challenged wiretap was *not* supported by probable cause, Asker's standing to attack this search would be limited. It is well established that "one cannot assert indirectly what he cannot assert directly." *See United States v. Scasino*, 513 F.2d 47, 51 (5th Cir. 1975). Asker can attack this search warrant based on the allegedly improper wiretap only to the extent that he can attack the wiretap itself. As Asker has standing to challenge the legality of the wiretap on Summa's phone only with respect to the lone conversation in which he was a participant, s*ee supra* Part II.A, he is similarly limited in using the allegedly illegal wiretap to challenge this search warrant. And as previously discussed, the single conversation that Asker *can* legally challenge is of such limited probative value that it could hardly amount to anything more than harmless error. *See supra* Part II.D.

B

Asker also argues that the affidavit misrepresented crucial aspects of the information acquired over the course of the investigation. Specifically, Asker argues that Swincicki intentionally misrepresented the scope of Summa's and Gallozi's drug transactions, just as he did in the wiretap affidavit. Here, however, the point of emphasis is not on their use of the word "bisla," but rather on their use of the word "half." Swincicki's believed that the word "half" was being used to refer to a half pound of marijuana. Asker argues, just as he did with respect to the

wiretap affidavit, that Swincicki "must have known" that Summa and Gallozi were engaged in securing "*user's quantities* of marijuana" rather than drug trafficking. Thus, Swincicki's reference to pounds of marijuana, when he knew that they were discussing ounces, was intentionally misleading. Because of this misrepresentation, Asker argues, the warrant lacks probable cause.

This inquiry mirrors the one we conducted with respect to Asker's challenge to the probable cause component of the wiretap application. *See supra* Part II.B. Asker bears the "heavy burden" of showing that the affiant made statements with "deliberate falsehood or [with] reckless disregard for the truth." *Bennett*, 905 F.2d at 934; *Franks*, 438 U.S. at 171. Even where the defendant can meet this burden, however, the warrant may still stand if "absent the challenged statements, there remains sufficient content in the affidavit to support a finding of probable cause." *Bennett*, 905 F.2d at 934.

Again, the district judge made limited findings on the record regarding her rationale for denying Asker's motion to suppress the search-warrant evidence. Judge Hood's decision, stated on the record, reads:

> The search warrant is based, I believe, on a finding that there is probable cause to believe that the individuals engaged in narcotics sales were investing narcotics proceeds in Happy's Pizza franchises for the purpose of the search warrant and in violation of the anti-money laundering statute.
> Evidence included in the affidavit show that the Defendants were involved in advising, directing and knowing investment of narcotics proceeds into Happy's Pizza franchises.

Here, as with Judge Hood's finding on Asker's motion to suppress the wiretap evidence, the court's ambiguous brevity verges on a Rule 12(d) violation. *See supra* Part II.B. Nonetheless, because the record provides sufficient evidence to support the district court's decision, we affirm.

The district court's determination that Swincicki's affidavit was truthful (or at least not recklessly false) is a finding of fact subject to clear-error review. *See United States v. Rice*, 478 F.3d 704, 709 (6th Cir. 2007) (citing *Bennett*, 905 F.2d at 934). On its face, Asker's argument has some merit. The record reflects that at least some agents became aware that Summa and Gallozi were discussing smaller amounts of drugs by June 17, 2010, when the connection was first made between "bisla" and ounce. Although this revelation occurred one week too late to cast serious doubt on Swincicki's truthfulness in the wiretap affidavit, the discovery happened a full *month* before Swincicki swore out this search warrant. At the *Franks* hearing in the trial court, Swincicki indicated that despite this significant passage of time, he had still not been made aware of this discovery. In addition, Asker argues that the dollar amounts discussed during these conversations were indicative of personal consumption rather than large-scale drug trafficking. Taken together, these facts raise a suspicion that Swincicki might have known more than he chose to let on in his affidavit.

We need not reach the merits of this argument, however, because even if we were to conclude that Asker had made this preliminary showing, the affidavit without Swincicki's misrepresentations still showed probable cause. *Bennett*, 905 F.2d at 934. The affidavit included testimony from two separate confidential informants, who stated that based on their conversations with Gallozi and others associated with Happy's Pizza, the restaurants were being used to launder narcotics proceeds. The affidavit also included evidence obtained from a January 2010 search of the home of suspected drug traffickers Mark and Jeffrey Markoz, which revealed a half-pound of marijuana and plans to help their father open a Happy's Pizza location through their relationship with Happy Asker. In addition, the affidavit referenced the contact list recovered during the 2009 trash pull at Happy's Pizza corporate headquarters, which included

numerous location owners with histories of narcotics trafficking. The affidavit included even more evidence that Happy's Pizza was involved in money laundering, including federal tax-return data that corroborated the testimony of confidential informants that drug traffickers routinely invested in Happy's Pizza locations. Taken together, the remaining evidence in the affidavit clearly makes out a showing of probable cause sufficient to support a search warrant for the Happy's Pizza corporate office.

C

Finally, Asker argues that the warrant was unconstitutionally overbroad. The Fourth Amendment prohibits limitless searches, requiring that warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This requirement is designed to protect against the "danger of unlimited discretion" inherent in a system that permits warranted searches of unspecified scope. *United States v. Savoca*, 761 F.2d 292, 298–99 (6th Cir. 1985). "[T]he degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought," making a warrant valid so long as "it is as specific as the circumstances and the nature of the activity under investigation permit." *United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988); *United States v. Blum*, 753 F.2d 999, 1001 (11th Cir. 1985). This court's approach is thus best characterized as a case-by-case determination that measures the particularity of the warrant against the nature of the crime alleged.

Asker argues that the search warrant for Happy's Pizza corporate office, which authorized a search of all records and documents "relat[ing] to the ownership, partnership, investment, construction and equipment costs, operating income and expenses, losses and/or distribution of income and/or profits attributable to each Happy's Pizza," was an improperly

overbroad "all records" search. Asker contends that, unless "the government establishes probable cause to believe that the entire business is merely a scheme to defraud or that all of the business's records are likely to evidence criminal activity," the warrant fails to meet the Fourth Amendment's particularity requirement. *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995); *see also United States v. Hanna*, 661 F.3d 271, 286 (6th Cir. 2011). This requires demonstrating that the alleged criminal activity was the "central purpose" of the place to be searched. *United States v. Rude*, 88 F.3d 1538, 1551 (9th Cir. 1996).

The terms of the warrant make it clear, however, that the warrant *was not* an "all records" search as Asker alleges. The warrant did not authorize a search for "every business record" in Happy's Pizza corporate office. *Kow*, 58 F.3d at 427. Instead, the warrant authorized the seizure of records that were specifically related to the alleged drug-trafficking and money-laundering activities. Given the scope of the alleged money laundering, this list is unsurprisingly large, but nonetheless tailored. The three general categories of documents mentioned by the warrant— franchise-location ownership, the identities of those owners, and the dividends paid to each investor—are all related to the government's suspicion that Happy's Pizza was involved in a scheme to launder narcotics-trafficking proceeds. That the documents covered by these search parameters are exceptionally numerous does not alter the fact that "[t]he description in the warrant is directed towards items likely to provide information concerning the [underlying offense] and therefore did not authorize the officers to seize more than what was reasonable under the circumstances." *United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988).

In any event, as the district court noted, even if we were to find that the warrant was constitutionally overbroad, the good-faith exception would still permit the introduction of gathered evidence. *United States v. Leon*, 468 U.S. 897 (1984), permits the introduction of

evidence "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Id.* at 922. While the good-faith exception is inapplicable where the issuing judge is "misled by information in an affidavit that the affiant knew was false," *id.* at 923, the warrant's alleged overbreadth is entirely unrelated to Asker's claim that it contained intentionally misleading information. As the alleged overbreadth is neither apparent on the face of the warrant nor the result of intentional misinformation, reliance upon it in the search of Happy's Pizza corporate offices was reasonable and the good-faith exception is applicable.

IV

Asker also argues that the district court erred when it denied his motion for a continuance in order to prepare for the government's introduction of Exhibit 597, a computer spreadsheet showing the weekly cash splits at several Happy's Pizza locations, and that had not been disclosed prior to trial. We review the denial of a motion for continuance for an abuse of discretion. *United States v. Amawi*, 695 F.3d 457, 480 (6th Cir. 2012).

A

We have consistently held that a district court possesses "broad discretion" in choosing whether or not to grant a request for a continuance, and that "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" will be deemed an abuse of discretion. *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). This is no "mechanical test[]"--rather, "we look for a showing from the defendant of prejudice, *i.e.,* a showing that the continuance would have made relevant witnesses available, or would have added something to the defense." *United States v. Wirsing*, 719 F.2d 859, 866 (6th Cir. 1983) (internal citations omitted).

Asker argues that the denial of his motion for a one-day continuance both prejudiced his defense and constituted an abuse of discretion. Asker's argument, however, ignores the fact that the contested spreadsheet was *taken from one of his own computers* in the Happy's Pizza corporate office, *and* had been previously disclosed to him in the form of a hard-drive image during the discovery process. Where a defendant has previously received evidence or owned its original source, we have consistently held that the trial court's decision to deny a motion for continuance constitutes neither prejudice nor an abuse of discretion. *See United States v. Cohen*, 515 F. App'x 405, 411 (6th Cir. 2013) (no abuse of discretion for denying a continuance to review copies of intercepted calls that the defendant previously received "well in advance of the hearing."); *United States v. Frost*, 914 F.2d 756, 765 (6th Cir. 1990) (no prejudice for denying a continuance to review checks that had been written from the defendant's partnership).

Nor does Asker succeed in making a showing of prejudice. Although he cries foul at the government's practice of choosing to produce the exhibit "in the middle of trial" that allegedly "went well beyond the very limited basis on which the case had been contested," Appellant's Br. at 50, he can identify no additional witnesses or pieces of evidence that he would have introduced had he been granted his requested one-day continuance. This failure is fatal to his claim that the district court made a reversible error. *See United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997) (finding no actual prejudice because the defendant "wholly failed to explain what counsel would have done differently had the district court granted the continuance.").

In light of Asker's failure to demonstrate reversible prejudice or that the district court abused its discretion, we affirm the district court's decision to deny Asker's motion for a continuance.

V

Lastly, Asker argues that the district court erred when it gave the government's proposed jury instruction on "deliberate ignorance." We review challenges to a jury instruction for an abuse of discretion. *United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012). A jury charge is not an abuse of discretion unless it "fails accurately to reflect the law," *United States v. Geisen*, 612 F.3d 471, 485 (6th Cir. 2010), and reversal is not warranted unless "the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Kuehne*, 547 F.3d 667, 679 (6th Cir. 2008).

A

"[T]he decision to give [the deliberate-ignorance] instruction is to be approached with significant prudence and caution . . . . Indeed, we have said that the instruction ought to 'be used sparingly.'" *Mitchell*, 681 F.3d at 876 (quoting *Geisen*, 612 F.3d at 486). It is an appropriate instruction where "(1) the defendant claims a lack of guilty knowledge; and (2) the facts and evidence support an inference of deliberate ignorance." *Ibid.* Thus, "the district court therefore must determine that there is evidence to support an inference 'that the defendant acted with reckless disregard of [the high probability of illegality] or with a conscious purpose to avoid learning the truth.'" *Ibid.* (alteration in original) (quoting *United States v. Seelig*, 622 F.2d 207, 213 (6th Cir. 1980)).

At trial, the district court concluded that the instruction was appropriate because "there are some statements made during the course of the Government's proofs and by the Defendant that I think may raise a question about whether or not there was some inference of deliberate indifference." Asker argues that the district court conflated mere "*absence* of knowledge – his defense – with avoidance of knowledge," thus diluting the government's burden of proof by

permitting jurors to "pile inference on inference" to find that he met the knowledge requirement of the statute. Appellant's Br. at 57–59. The government argues that this "circumstantial evidence" distinction is unfounded in prior case law, and in any event is swallowed up by the harmless-error doctrine. Appellee's Br. at 54–55.

The record and the case law both favor the government's position. Asker testified that he was not aware that both his tax returns and the tax returns for Happy's Pizza were false, satisfying the first element for an instruction on "deliberate ignorance." The remainder of the evidence on the record seems to support an "inference of deliberate ignorance." *Mitchell*, 681 F.3d at 876. With respect to the invalid tax returns, Asker claims that he signed them without going over them with his accountant, and that other employees at Happy's Pizza were responsible for reviewing the corporate returns for accuracy. Asker similarly argues that his job required him to focus on big-picture business issues, leaving the management of individual stores to their franchisee-owners. His argument is analogous to the one rejected by this court in *Mitchell*, where we permitted a deliberate-ignorance instruction where the defendant claimed that "despite his long tenure in the firm, he paid little attention to the clients of his partners and knew little about the actual running of the law firm." *Id.* at 878. Just as in *Mitchell*, where the defendant consistently accepted payments from his firm's profit-sharing scheme "without knowing where they were coming from," Asker drew his share of the weekly cash profits from the stores he owned while claiming ignorance of the fraudulent scheme that made those inflated profits possible. *Ibid.* Additionally, Asker hired the accountants whom he alleged were responsible for the fraud, and worked from the corporate office that the evidence indicated actively monitored the finances of each individual Happy's Pizza location. *Ibid.* (finding a deliberate-indifference instruction appropriate where the defendant had access to the firm's

financial accounts). Taken together, this evidence is sufficient to support an instruction of "deliberate indifference."

Asker's argument that the deliberate-ignorance instruction diluted the government's burden also fails. We have previously held that the presentation of "deliberate ignorance as an alternative to actual knowledge, either of which satisfies the statutory knowledge requirements" does not run the risk that the jury will misunderstand the government's burden of proving guilt beyond a reasonable doubt. *United States v. Patel*, 651 F. App'x 468, 472 (6th Cir. 2016).

In any event, any error in the giving of the instruction is harmless. This court has held that even when unsupported by the evidence, "a deliberate ignorance instruction that properly states the law is harmless error." *United States v. Rayborn*, 491 F.3d 513, 520–21 (6th Cir. 2007). Consequently, we "will not overturn a jury's verdict so long as sufficient evidence supports one of the grounds for conviction" on each count. *Ibid.* This conclusion rests on the notion that an instruction on deliberate ignorance, "by its own terms, only applies when there is sufficient evidence to support a finding of deliberate ignorance beyond a reasonable doubt." *United States v. Mari*, 47 F.3d 782, 785 (6th Cir. 1995). Thus, "even if we assume that there was insufficient evidence to justify giving the instruction, the jury, in following the instruction, must *not* have convicted the defendant on the basis of deliberate ignorance." *Ibid.* Stated differently, as long as the instruction accurately states the law and the record reflects sufficient evidence to convict the defendant on alternative grounds (such as actual knowledge), we assume that the jury convicted the defendant on those alternative grounds. To conclude otherwise, and find that the jury actually convicted the defendant on a theory of deliberate ignorance despite insufficient evidence, "we would have to assume that the jury ignored the jury instructions." *Ibid.* Such an inference "flies in the face of a fundamental tenet of our jury system and has broad detrimental

implications we are unwilling to embrace." *United States v. Stone*, 9 F.3d 934, 940 (11th Cir. 1993). Here, the instruction given conforms with Sixth Circuit Pattern Criminal Jury Instruction § 2.09, and the government presented substantial evidence suggesting that Asker was actually aware of the tax fraud that Happy's Pizza was perpetrating. Therefore, even if we did consider the instruction to be unsupported by the record, the error would be harmless in Asker's case.

## VI

Asker seeks to vacate his criminal conviction on the grounds that the district court committed several errors over the course of his trial. He is not entitled to that relief because he has failed to raise facts or legal challenges sufficient to surmount the deference we typically give to the district courts in these matters. Alternatively, Asker's challenge fails because even where he might be deemed to have made a plausible case for error, that error was ultimately harmless. For all of these reasons, we UPHOLD the district court's rulings and AFFIRM Asker's conviction.