UNITED STATES of America, Appellee,

v.

Nicholas CIVELLA, Appellant.

UNITED STATES of America, Appellee,

v.

Peter TAMBURELLO, Appellant.

UNITED STATES of America, Appellee,

v.

John TORTORA, Appellant.

Nos. 80–1828, 80–1829 and 80–1844.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 13, 1981.

Decided May 13, 1981.

Rehearing and Rehearing En Banc
Denied June 10, 1981.

Robert Beaird, Kansas City, Mo., for Peter Tamburello.

Richard Knight, Kansas City, Mo., for John Tortora.

Oscar B. Goodman, Las Vegas, Nev. (argued), and Byron Neal Fox, Kansas City, Mo., for Nicholas Civella.

Ronald S. Reed, Jr., U. S. Atty., W. D. Missouri, Sheryle L. Jeans, David B. B. Helfrey, Attys., U. S. Dept. of Justice, Kansas City, Mo., William C. Bryson, Atty., U. S. Dept. of Justice, Washington, D. C. (argued), for appellee.

Before ROSS, HENLEY and McMILLIAN, Circuit Judges.

ROSS, Circuit Judge.

On July 18, 1980, appellants Civella, Tamburello and Tortora were convicted by a

jury on a two count indictment charging them with conspiring to bribe a public official [1] and using the communication facilities in interstate commerce in carrying out their conspiracy.[2] The evidence against these men consisted primarily of nine taped recordings of their conversations, which were intercepted by federal agents pursuant to court orders dated September 24 and November 10, 1978. The defendants moved, before, during and after the trial, to suppress these recordings. The defendants also filed pretrial motions to dismiss the indictment, alleging that the grand jury was prejudiced by preindictment publicity. These motions and a subsequent motion for a new trial or for a judgment of acquittal were denied by the district court.[3] This timely appeal follows.

The tape recordings which were introduced into evidence at trial were obtained in the course of an ongoing investigation by federal agents which followed a series of alleged "gangland style" murders in Kansas City. On May 5, 1978, based on information that another murder was about to be committed, federal agents sought and received authority to install electronic surveillance devices on four automobiles. The application for the court order asserted that there was probable cause to believe that an "enterprise" existed which was involved in a pattern of "racketeering activity" in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) and (d). The application further alleged that the offenses underlying the RICO violation were violations of various Missouri statutes relating to murder, attempted murder, conspiracy to commit murder and extortion, and several federal statutes relating to conspiracy, obstruction of justice and investigations, and interference with commerce by threats and violence.[4]

No evidence was obtained pursuant to this first order.

On May 25, 1978, an extension of the May 5 order was granted which covered the same four automobiles, two tables in a restaurant in Kansas City and several additional individuals. The application contained repetitions of the probable cause cited in the May 5 application but added information relating to a murder committed on May 16, 1978, and allegations that the "enterprise" was engaged in extortionate credit practices and gambling offenses.[5] No conversations of the three appellants were overheard pursuant to this second order.

Several subsequent applications were approved by the district courts which broadened the scope of the investigation.[6] Although Nicholas Civella and Peter Tamburello were mentioned in the affidavits in support of the first two applications, Civella was first identified as a target of the interceptions in the third court order, dated July 29, 1979. Tamburello was first named as a target of the interceptions in the fifth order, dated August 30, 1978. John Tortora was never named as a target of the investigation in any of the court orders. The tape recordings which provided the evidence for their convictions for conspiring to bribe a public official were gathered pursuant to later orders, issued on September 24 and November 10, 1978.

The defendants were indicted on February 13, 1980. On May 5, 1980, several pretrial motions were filed, including motions for dismissal of the indictment due to massive prejudicial publicity and to suppress the tape recordings. A separate motion for dismissal of the indictment due to massive prejudicial publicity was filed, alleging that the United States Department of Justice and other government officials had gener-

---

1. 18 U.S.C. §§ 201(b)(1), 371 and 2.

2. 18 U.S.C. §§ 1952 and 2.

3. The United States District Court for the Western District of Missouri, the Honorable Scott O. Wright, District Judge, presiding.

4. 18 U.S.C. §§ 371, 1503, 1510 and 1951.

5. 18 U.S.C. §§ 982, 893, 894 and 1955.

6. In addition to the May 5 and May 25 orders, wiretap authorizations were granted on July 29, August 12, August 30, September 24, October 7, November 10, November 22 and November 30, 1978, and on January 2, February 2 and February 4, 1979.

ated prejudicial publicity against the defendants. An evidentiary hearing was held on these and other motions and these motions were subsequently denied in the trial court's memorandum and order of July 14, 1980.

On appeal the defendants again argue that the tape recordings should have been suppressed, and they repeat their allegation that the indictment should have been dismissed because of the preindictment publicity. The appellants also challenge the trial court's failure to instruct the jury on their theory of the law. For the reasons set forth below, we affirm the convictions of all three appellants.

*SUPPRESSION OF THE TAPE RECORDINGS*

Appellants' May 5, 1980 motion to suppress the tape recordings raised several challenges to the legality of the first two and subsequent interception orders, and these arguments are raised again on appeal. The appellants rely primarily, however, on one argument which was reasserted in a memorandum in support of their motion for a new trial, in light of *United States v. Anderson*, 626 F.2d 1358 (8th Cir. 1980), cert. denied, —— U.S. ——, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981), which was filed by this court on August 7, 1980.

The appellants contend that this court's decision in *Anderson* confirms their argument that the May 5 and May 25 orders were issued without probable cause. In *Anderson* this court addressed the issue of what constitutes an "enterprise" for purposes of the RICO statute, and the panel's decision in that case raises serious questions about whether the affidavits and the applications of the government in this case provided probable cause to support its theory that an "enterprise," in fact, existed. It is further asserted that if the May 5 and May 25 orders were issued without probable

cause, then all of the subsequent orders, which were based on information obtained pursuant to the initial orders, must also be illegal.

In *Anderson* the defendants, both county judges, were convicted of substantive RICO violations for accepting bribes and kickbacks in their capacities as county purchasing agents, in violation of 18 U.S.C. § 1962(c) and (d):

(c) It shall be unlawful for any person employed by or associated with any *enterprise* engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs *through a pattern of racketeering activity* or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

(Emphasis supplied.) On appeal, this court concluded, however, that the defendants' scheme of defrauding their respective counties did not constitute an "enterprise" within the meaning of the statute because the set of facts which were asserted to prove the existence of the enterprise—namely, the scheme of accepting bribes—were the very same facts which were asserted to prove the element of "a pattern of racketeering activity.[7] In the panel's view, the element of the crime which involved participation in an "enterprise" required a showing of a "discrete economic association existing *separately* from the racketeering activity." *United States v. Anderson, supra*, 626 F.2d at 1372 (emphasis supplied). Thus, the court, in overturning the convictions of the defendants on the counts alleging RICO violations held that:

---

**7.** 18 U.S.C. § 1961(1) defines "racketeering activity" as "any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year," and "any act which is indict-

able under any of the following provisions of title 18, United States Code:" sections 201, 224, 471–473, 659, 664, 891–894, 1084, 1341, 1343, 1503, 1510, 1511, 1951–1955, 2314, 2315, 2341–2346, 2421–2424, and 29 U.S.C. §§ 186 and 501(c), and various offenses under title 11.

Congress intended that the phrase "a group of individuals associated in fact although not a legal entity," as used in its definition of the term "enterprise" in section 1961(4), to encompass only an association having an ascertainable structure which exists for the purpose of maintaining operations directed toward an economic goal that has an existence that can be defined apart from the commission of the predicate acts constituting the "pattern of racketeering activity."

*Id.*[8]

Based on the interpretation of the RICO statute set forth in *Anderson,* the appellants contend that the tape recordings in this case should have been suppressed. Since the May 5 and May 25 applications and orders alleged no activities of the suspected enterprise beyond violations of state and federal statutes which are listed in 18 U.S.C. § 1961(1) as the activities which constitute "racketeering activity,"[9] it is claimed that there was no probable cause to support the alleged RICO violation because there was no evidence of a "discrete economic association existing *separately* from the racketeering activity."

We decline to reach the merits of the appellants' challenge to the May 5 and May 25 orders, however, for two reasons. In the first place, the appellants have no "standing" to challenge the two court orders.[10] Second, we find no compelling reason for applying the *Anderson* decision retroactively in this case.

■ The two court orders based on alleged RICO violations provide no grounds for the appellants' fourth amendment claims. Our review of the case law and the federal wiretap statute[11] indicates that a defendant may challenge evidence gathered pursuant to an interception order only if it is shown "that it was directed at *him,* that the Government intercepted *his* conversations or that the wiretapped communications occurred at least partly on *his* premises." *United States v. Williams,* 580 F.2d 578, 583 (D.C.Cir.), *cert. denied,* 439 U.S. 832, 99 S.Ct. 112, 58 L.Ed.2d 127 (1978). As the Supreme Court held in *Alderman v.*

---

**8.** At the time of the court's opinion in *Anderson,* as was pointed out therein, the Sixth Circuit was this court's "sole ally," and its opinion in *United States v. Sutton,* 605 F.2d 260 (6th Cir. 1979), *vacated and submitted for rehearing en banc,* April 2, 1980, 642 F.2d 1001 (6 Cir.) required proof that the enterprise encompass only *legitimate* associations, whereas *Anderson* required the somewhat different showing of a "discrete economic association existing separately from the racketeering activity."

Since the filing of the *Anderson* opinion, the Sixth Circuit has overruled its previous opinion and adopted the theory that the term "enterprise," as employed in RICO, also encompasses associations of individuals which have no legitimate purpose. *United States v. Sutton,* 642 F.2d 1001 (6th Cir. 1980) (en banc), *rev'g United States v. Sutton,* 605 F.2d 260 (6th Cir. 1979).

At the time of writing this opinion, the only circuit which has taken a position similar to the Sixth Circuit's original position in *Sutton* is the First Circuit, in *United States v. Turkette,* 632 F.2d 896 (1st Cir. 1980), *cert. granted,* —— U.S. ——, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). The Supreme Court will ultimately decide that case. Other courts have maintained their positions or in other instances have specifically rejected the rationale set forth in both *Anderson* and *Turkette. See, e. g., United States v. Clemente,* 640 F.2d 1069 (2d Cir. 1981); *United*

*States v. Mannino,* 635 F.2d 110, 117 (2d Cir. 1980); *United States v. Sutton, supra,* (6th Cir. 1980).

**9.** *See* nn. 4, 5 and 7, *supra.*

**10.** Since *Rakas v. Illinois,* 439 U.S. 128, 139, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978), the traditional theories of standing have been "more properly subsumed under substantive Fourth Amendment doctrine," which focuses on "the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." In our view, however, the result in this case would be the same under either approach.

**11.** 18 U.S.C. § 2518(10)(a) provides, in part, that "[a]ny aggrieved person * * * may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom," on the ground that it was unlawfully intercepted. The term "aggrieved person" is defined in 18 U.S.C. § 2510(11) as any "person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." *See United States v. Jabara,* 618 F.2d 1319, 1326 (9th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 154, 66 L.Ed.2d 70 (1980).

*United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969):

> The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself not by those who are aggrieved solely by the introduction of damaging evidence.

■ This same principle is applicable in the present appeal, where defendants challenge evidence intercepted pursuant to a wiretap order on the ground that the order was tainted by illegally obtained evidence gathered under the authority of an earlier, unconstitutional wiretap order. Under similar circumstances, this court has held that the fourth amendment protections are available only to those whose rights were violated by the earlier wiretap order:

> It is urged by appellants Bonfiglio and Cappellano, Jr. that the 1973 tap was tainted by the government's knowledge of and use of the evidence illegally obtained by the 1970 tap. Bonfiglio and Cappallano, Jr. clearly are without standing to raise this contention. Neither was named as a target in the 1970 wiretap application, and neither was a party to a conversation recorded or intercepted as a result thereof. Fourth Amendment protections applicable to electronic surveillance are available only to those whose rights were violated by the search itself, not to "those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States,* 394 U.S. 165, 172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969).

*United States v. Abramson,* 553 F.2d 1164, 1170 (8th Cir.), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977). *Accord, United States v. Williams, supra,* 580 F.2d at 583; *United States v. Fury,* 554 F.2d 522, 525–26 (2d Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *United States v. Plotkin,* 550 F.2d 693, 694–95 (1st Cir.), *cert. denied,* 434 U.S. 820, 98 S.Ct. 61, 54 L.Ed.2d 76 (1977).

Although we are aware that Nicholas Civella and Peter Tamburello were named in the affidavits in support of the May 5 and May 25 applications, we find this insufficient to invoke the suppression doctrine for the protection of their fourth amendment rights. None of the defendants are named as "targets" of the first two interception orders, and none of their conversations were recorded under the authority of the challenged orders. We have carefully reviewed the challenged affidavits, applications and orders, and we find no basis for the application of the suppression doctrine simply because the overall investigation may in some way have been directed against Civella and Tamburello. *Cf. Rakas v. Illinois,* 439 U.S. 128, 134–35, 99 S.Ct. 421, 426, 58 L.Ed.2d 387 (1979).

■ Second, even if the defendants had grounds for asserting that their fourth amendment rights were violated by the challenged orders, we still would decline to reach the merits of their claim. Our review of the case law and the affidavits, applications and orders, has convinced us that the May 5 and May 25 orders were supported by probable cause at the time they were issued, and we find no justification under the facts of this case for suppressing the fruits of that investigation simply because this court issued a new interpretation of the RICO statute *after* the defendants had been indicted, tried and convicted of substantive offenses under other statutes.

In *Anderson, supra,* 626 F.2d at 1372, Judge Gibson noted that the holding of the court placed this circuit in "direct opposition" to virtually every court which had considered the issue. And at the time the challenged orders were issued, no court had adopted a position similar to this court's in *Anderson.* Thus, the investigating officers in this case were operating under a "presumptively valid" interpretation of RICO, and we do not understand the probable cause standard to require the investigating officers to know that the prevailing interpretation of a statute might eventually be held invalid or unconstitutional. *Michigan v. DeFillippo,* 443 U.S. 31, 37–38, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979). Moreover, under these circumstances, no under-

lying purpose of the exclusionary rule requires the suppression of the evidence. "No conceivable purpose of deterrence would be served by suppressing evidence which" at the time it was intercepted, was the product of a lawful interception order. *Id.* at 38 n. 3, 99 S.Ct. at 2633 n. 3.

Finally, we have examined the appellants' remaining challenges to the interception orders, including claims that the subsequent interceptions which provided the evidence for the convictions were not minimized, that the affidavits failed to satisfactorily state why other investigative procedures were not employed, that the affidavits failed to demonstrate the need for the wire and oral interceptions and that the interceptions were unconstitutional. We have considered these claims and find them to be without merit. Accordingly, the district court's denial of the motion to suppress the tape recordings is affirmed.

## GRAND JURY BIAS

■ Appellants' two motions for the dismissal of the indictment are founded on the claim that the grand jury was biased by massive prejudicial publicity which spanned a period of more than a decade prior to the indictment. The affidavit of Scott Whiteside of the Kansas City Star and the volume of news articles attached to it are convincing evidence of the publicity surrounding appellant Civella and, to a much lesser degree, Peter Tamburello. Nevertheless, we conclude, as Judge Wright did, that the appellants have failed to carry their burden of proving that the grand jury was, in fact, prejudiced.

■ The first motion to dismiss is a general challenge to the grand jury indictment, alleging in a conclusory fashion that the grand jury was biased by the publicity referred to above. Dismissal of an indictment on such grounds is an extreme remedy, and the burden to be carried by a party seeking such relief is appropriately a heavy one:

> The cases which have considered the question of preindictment publicity and its effect on the grand jury, rather than holding that preindictment publicity is in-

herently prejudicial and cause for dismissal of the indictment, have held that the defendant must show specifically that such publicity caused prejudice and bias in the grand jurors and that the indictment returned was the result of essential unfairness.

*United States v. Anzelmo,* 319 F.Supp. 1106, 1113 (E.D.La.1970) (and cases cited therein). We agree with the district court that "the defendants have failed, despite strenuous efforts, to prove that preindictment publicity did, in fact, influence or prejudice the grand jury in returning an indictment against them * * *."

The second motion for dismissal of the indictment raises the more serious allegation that much of the prejudicial publicity was government-engendered, and the appellants suggest that a showing of actual prejudice is unnecessary under such circumstances. We disagree.

The appellants refer specifically to interviews granted by government officials to members of the press which resulted in a five-part series of articles in the Kansas City Star, and to press releases issued by the FBI. These releases of information are alleged to have been "orchestrated" with the intent to "create in the public mind a favorable image of the forces of prosecution and a highly prejudicial image of the Defendants under investigation." These and other instances of alleged government misconduct are claimed to have amounted to a denial of due process and a violation of Department of Justice Regulation 28 C.F.R. § 50.2, relating to the release of certain types of prejudicial information.

As the trial court observed, an "argument nearly identical to the defendants' was made" in *United States v. Stanford,* 589 F.2d 285, 298–99 (7th Cir. 1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979). In that case, the defendants claimed that prejudicial publicity was generated by a United States Attorney throughout the grand jury investigation and the trial, in violation of the fifth and sixth amendments and 28 C.F.R. § 50.2.

The Seventh Circuit Court of Appeals affirmed the district court's refusal to dismiss the indictment on these grounds, however, because the defendants had failed to show prejudice:

> Furthermore, the defendants' allegation that the generation of publicity was intentional misconduct, even if true, does not merit a dismissal of these indictments. * * * To dismiss the indictments here in the absence of any showing of prejudice would * * * constitute a "punishment of society for misdeeds of a prosecutor."

*Id.* at 299. And although the court held that the prosecutor "may have violated 28 C.F.R. § 50.2," the court found no basis on that ground for "dismissing the indictments challenged here." *Id.* at 300.

■ In our view, Judge Wright was correct in holding that "it is the prejudicial effect of preindictment publicity, rather than its source, which is the significant consideration in determining whether an indictment should be dismissed. *Accord, United States v. Archer*, 355 F.Supp. 981, 987–88 (S.D.N.Y.1972)." And although we feel no necessity to comment on the content of the government press releases and interviews in the absence of a showing of prejudice, we note that the information complained of relates primarily to matters of public record. *United States v. Archer, supra*, 355 F.Supp. at 988. Finally, although Judge Wright found it unnecessary to rule on the merits of the claim that the government agents violated 28 C.F.R. § 50.2, it was specifically noted "that there was little, if any, evidence to support this claim." Accordingly, the denials of the motions to dismiss the indictment are affirmed.

### *JURY INSTRUCTIONS*

The appellants' final claim is that the district court erred in not instructing the jury as requested in two of their proposed instructions. Again, we disagree.

The nine tape recordings which were introduced into evidence revealed that the appellants were involved in a scheme to bribe the warden of a federal correctional center in Ft. Worth, Texas, to obtain the transfer of Anthony Civella, the defendant's nephew, to a minimum security prison. Tortora, an inmate of the Ft. Worth institution, agreed with Civella that he would discuss the possibility with the warden. The remaining conversations involved all three of the appellants and laid the groundwork for the entire scheme, including the plans for the payment, the plans for the transfer and the reports on the progress of the schemes.

■ Defendants' Instruction A attempts to downplay the significance of these conversations by implying that the conversations do not constitute overt acts:

> Mere conversation, in and of itself, cannot be construed as the basis for proof of a conspiracy.

This is clearly an incorrect statement of the law. Telephone conversations and meetings in which plans and arrangements are made in furtherance of the conspiracy are overt acts. *United States v. Marable*, 574 F.2d 224, 230 (5th Cir. 1978). Therefore, Instruction A was properly refused. *United States v. John Bernard Industries, Inc.*, 589 F.2d 1353, 1361 (8th Cir. 1979).

■ Defendants' Instruction B similarly misstates the law of conspiracy:

> If you find that overt acts alleged in acts 3–9 of the indictment were not made to influence the decision of the warden, then the conversations of the defendants do not constitute a violation of law.

This instruction confuses the crime underlying the conspiracy with the agreement to commit that particular crime, which is the "essence" of the crime of conspiracy:

> The essence of the crime of conspiracy is the agreement and not the commission of the crime which is the object of the conspiracy. *United States v. Rabinowich*, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211. It is immaterial to the commission of the crime of conspiracy whether the object of the conspiracy is achieved.

*United States v. Carlton*, 475 F.2d 104, 106 (5th Cir.), *cert. denied*, 414 U.S. 842, 94 S.Ct. 100, 38 L.Ed.2d 80 (1973). Accordingly, the

appellants were also properly denied this instruction. *United States v. John Bernard Industries, Inc., supra,* 589 F.2d at 1361.

Accordingly, we find no error in the trial court's refusal to give the instructions requested by the appellants. In light of this conclusion and the conclusions reached in the preceding sections of this opinion, the convictions of the appellants are affirmed.