RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0048p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LERON LIGGINS,

*Defendant-Appellant.*

No. 24-1894

─────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:18-cr-20071-1—Matthew F. Leitman, District Judge.

Argued: October 23, 2025

Decided and Filed: February 18, 2026

Before: WHITE, STRANCH, and MURPHY, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Wade G. Fink, WADE FINK LAW, P.C., Birmingham, Michigan, for Appellant. Andrea Hutting, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Wade G. Fink, WADE FINK LAW, P.C., Birmingham, Michigan, for Appellant. Andrea Hutting, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

─────────────

## OPINION

─────────────

MURPHY, Circuit Judge. The police learned of Leron Liggins's drug distribution after intercepting his coconspirator's calls. Liggins moved to suppress the evidence derived from these calls based on a defect in the underlying wiretap application. But the federal wiretap laws allow only an "aggrieved person" to file such a motion. They define "aggrieved person" as "a

person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed[.]" 18 U.S.C. § 2510(11). Courts disagree over this definition's scope. Some read it to adopt the Fourth Amendment's standing rules, which grant standing to those who participated in an intercepted call or who owned the property from which the call occurred. Others interpret it to reach the "targets" of a wiretap application too. Liggins asks us to adopt the broader view. At day's end, though, we need not choose between the two approaches because Liggins would not qualify as an "aggrieved person" either way. He did not participate in the intercepted calls, the calls did not use his cellphone or occur at his home, the wiretap application did not identify Liggins as a "target" of the investigation, and no evidence suggests that he was otherwise an unnamed target. We thus affirm.

I

In 2015, federal and state authorities came to suspect a woman named Luz Jiminez of participating in a large-scale drug-trafficking organization from Phoenix, Arizona. The authorities sought a wiretap order so that they could intercept the communications of Jiminez, several accomplices, and "other co-conspirators yet unknown[.]" Aff., R.170-1, PageID 2031. An Arizona judge authorized the wiretap of several phones on October 9, 2015.

These intercepts led the Arizona investigators to Liggins. On October 21 and 22, they overheard Jiminez tell other coconspirators that she planned to pick up luggage for someone named "Rondo" at the Phoenix airport. It turns out that Rondo was Liggins. And Liggins and Jiminez had coordinated a so-called "check and miss"—a practice in which drug dealers buy an airplane ticket to ship a bag of drugs or money but do not get on the flight to avoid detection. Liggins bought a ticket to fly from Detroit to Phoenix on October 22. Yet he did not take the flight and sent only a checked bag. Liggins packed this bag with $36,940 in cash earned from heroin sales.

The Arizona investigators monitored Jiminez as she picked up the bag at the Phoenix airport's baggage claim. When Jiminez started walking away with the bag, she noticed individuals following her. So she dropped the bag and fled the airport. A police dog alerted to the smell of drugs on the abandoned bag. The investigators, relying on their observations at the

airport but not the wiretapped conversations, obtained a warrant to search the bag and found the money inside.

About five weeks later, in early December 2015, Liggins also came to the attention of federal and state authorities in Detroit. A "credible source" told a Detroit officer that a woman named DeHaven Murphy "was involved in trafficking narcotics." King Tr., R.172, PageID 2218–20. The officer learned that Murphy planned to fly from Detroit to Phoenix on December 3 and would likely possess heroin. On that date, the police located Murphy's bag on the tarmac where airline employees load luggage onto planes. A police dog sniffed the bag and alerted to the presence of narcotics. Officers located Murphy at the gate and asked for her consent to search the bag. She agreed. They found over 300 grams of heroin inside. Murphy later told the officers that she had undertaken the trip for Liggins, and they arranged for her to set up several recorded calls with him. Detroit officers testified that they had no contact with Arizona officers before Murphy's arrest. The district court found that Murphy's arrest "was based on information that was entirely separate from the [Arizona] wiretap[.]" Tr., R.186, PageID 2489.

Years later, the government charged Liggins with two drug counts. It alleged that he conspired to possess with the intent to distribute illegal narcotics (including at least 100 grams of heroin) between 2015 and 2018. And it alleged that he aided and abetted another person in possessing with the intent to distribute at least 100 grams of heroin in December 2015.

Liggins initially stood trial. A jury convicted him of both counts. But we held that the district judge should have recused himself from the case because of the appearance of bias created by various remarks at a pretrial hearing. *See United States v. Liggins*, 76 F.4th 500, 505–09 (6th Cir. 2023). We thus vacated Liggins's conviction and remanded for a new trial before a different district judge. *See id.* at 509.

On remand, Liggins argued that the wiretap obtained by the Arizona officers to monitor Jiminez's communications violated the federal wiretap laws. He relied on this alleged violation to move to suppress two categories of evidence. As for the first category, Liggins argued that this violation required the district court to suppress the cash seized at the Phoenix airport and Jiminez's testimony as fruit of the poisonous tree. As for the second category, Liggins argued

that the violation may well require the court to suppress the heroin seized at the Detroit airport and Murphy's testimony because the Detroit officers may have obtained their information about Murphy from the Arizona investigation.

The district court denied Liggins's motion. The court first held that Liggins lacked standing to challenge the interception of Jiminez's communications on October 21 and 22. It reasoned that Liggins had not been a party to those calls, that the parties who had made the calls did not do so from Liggins's property, and that the affidavit requesting the warrant did not target him as part of the investigation. And because the calls from those two dates led to the investigation into Liggins, his lack of standing doomed the request to suppress any evidence uncovered during that investigation. The court also found that the investigation into Murphy arose from "information that was entirely separate from the wiretap that happened in Arizona." Tr., R.186, PageID 2489. Because the evidence recovered from that Detroit investigation "was not tainted by the wiretap," the court saw no basis to suppress it even if Liggins had standing. Tr., R.187, PageID 2504.

Liggins chose not to stand trial again. He instead entered a conditional guilty plea that preserved his right to appeal the denial of his motion to suppress. The district court sentenced him to 90 months' imprisonment. Liggins exercised his right to appeal.

II

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 governs the interception of wire, oral, or electronic communications in the United States. *See* 18 U.S.C. §§ 2510–2520; *United States v. Gardner*, 32 F.4th 504, 514–15 (6th Cir. 2022). Title III generally prohibits the unauthorized interception of these communications. *See* 18 U.S.C. § 2511(1). It also establishes the procedures that federal and state officers must follow to obtain judicial orders that permit them to intercept these communications. *See id.* §§ 2516, 2518.

The government in this case does not dispute that Arizona authorities violated Title III's procedures when they obtained a wiretap order. Title III allows "[t]he principal prosecuting attorney of any State" (e.g., an attorney general) "or the principal prosecuting attorney of any political subdivision" (e.g., a county prosecutor) to apply for this type of order. *Id.* § 2516(2).

Yet an assistant attorney general in Arizona—not the elected attorney general—signed the wiretap application seeking to intercept Jiminez's communications. We will simply assume that this application violated Title III given that the parties have not briefed that legal question.

This case instead concerns the proper remedies for the violation. Title III bars courts from "receiv[ing] in evidence" "any wire or oral communication" intercepted in violation of its provisions as well as any "evidence derived" from that illegally intercepted communication. *Id.* § 2515. And the title also allows "[a]ny aggrieved person" to "move to suppress the contents" of an illegally intercepted communication or the "evidence derived" from it. *Id.* § 2518(10)(a).

On appeal, the parties debate two questions about this text: Did Liggins qualify as an "aggrieved person" with so-called statutory "standing" to challenge the Arizona wiretap? And if so, was the link between that wiretap order and the evidence that Liggins seeks to exclude too attenuated for the evidence to have been "derived" from the order? Liggins does not dispute that if we agree with the government's answer to either question, we can uphold the denial of his motion to suppress without considering the other one. We thus opt to deny his motion on the sole ground that he does not qualify as an "aggrieved person." Before getting to the merits of that question, though, we must start with Liggins's claim that the district court should not have reached it.

### A. Preservation

Liggins alleges that the government either waived or forfeited its claim that he did not qualify as an "aggrieved person" under Title III. He is mistaken.

1. *Background*. The parties litigated this issue in a convoluted way. In a pretrial brief, the government conceded that Arizona officials had not "properly authorized" the wiretap interceptions, so it did "not intend to introduce them as evidence[.]" Trial Br., R.88, PageID 443–44. The government also suggested that the money it recovered from Liggins's bag was presumptively "inadmissible" because it uncovered the bag based on the wiretap interceptions. *Id.*, PageID 444. But it asserted that this "evidence [was] attenuated and therefore admissible" because Jiminez would (and did) testify at trial that she abandoned the bag. *Id.*

Title III generally tells criminal defendants to challenge wiretap orders in a pretrial motion to suppress. *See* 18 U.S.C. § 2518(10)(a); Fed. R. Crim. P. 12(b)(3)(C). Yet Liggins did not move to suppress any evidence or contest the government's attenuation claim before trial. Instead, Liggins first raised this Title III issue after the jury had convicted him in a posttrial motion seeking a new trial under Federal Rule of Criminal Procedure 33. The government responded by arguing that the trial evidence lacked a nexus to the illegal wiretap order; it did not claim that Liggins lacked "aggrieved person" status. The district court denied the claim on these attenuation grounds.

In the first appeal to this court, Liggins renewed this wiretap argument (in addition to his argument that the district judge should have recused). The government again did not respond with any aggrieved-person argument. It instead argued that Liggins did not timely raise this argument and that all evidence admitted at trial lacked the required connection to the illegal wiretap order. Because we vacated the judgment and remanded for a new trial on the ground that the district judge should have recused, we did not consider this Title III issue. *See Liggins*, 76 F.4th at 509.

In this second round of litigation, Liggins filed a pretrial motion to suppress the two categories of evidence (the cash and Jiminez's testimony concerning the Arizona operation and the heroin and Murphy's testimony concerning the Detroit operation) on the ground that the government derived this evidence from the wiretap order. In an initial response, the government again raised only an attenuation argument. At a later bail hearing, however, the new district judge asked Liggins whether he qualified as an aggrieved person with standing to challenge the wiretap order under Title III. Although the court raised the question on its own, it explained that it did so in response to arguments in Liggins's brief. The court's questioning led the parties to file supplemental briefs on the issue and argue about it at the suppression hearing.

When ruling on the motion to suppress, the district judge held that the government had preserved this issue. Even though the government did not raise it in the initial round of litigation, the court viewed our remand order as reopening all issues. And it found that the government "timely" raised the issue on remand by filing a "supplemental brief" before the suppression hearing. Tr., R.187, PageID 2508. It added that Liggins had a "full opportunity" to

brief and argue the matter as well. *Id.* We review the court's conclusion that the government preserved this claim de novo while evaluating any underlying factual findings for clear error. *See Walker v. United States*, 134 F.4th 437, 444 (6th Cir. 2025).

2. *Analysis*. Has the government preserved this aggrieved-person argument? At the outset, we must clarify whether the government can *ever* waive or forfeit the argument. Courts often say that defendants may challenge a wiretap order only if they have "standing." *See, e.g.*, *United States v. Asker*, 676 F. App'x 447, 454 (6th Cir. 2017). And some standing doctrines—most notably, Article III standing—impose jurisdictional limits that parties cannot waive or forfeit. *See Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662–63 (2019). But one should not confuse Title III standing for Article III standing. Title III standing raises a *merits* question about whether a defendant is an "aggrieved person" who may file a motion to suppress—not a *jurisdictional* question about whether a plaintiff has asserted a proper "case or controversy." *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–26, 128 n.4 (2014); *United States v. Jackson*, 849 F.3d 540, 550 (3d Cir. 2017). In this respect, Title III standing resembles what courts have called Fourth Amendment "standing," which raises a similar merits question about whether defendants have shown that an allegedly unlawful search invaded their "personal" rights. *United States v. Russell*, 26 F.4th 371, 374 (6th Cir. 2022) (citations omitted).

As with Fourth Amendment standing, then, the government can waive or forfeit a challenge that a defendant lacks Title III standing. *See id.* at 373. What does the law require for the government to *waive* its statutory claim that Liggins is not an "aggrieved person"? Title III says nothing on this topic. When statutes are silent, courts "presum[e]" that Congress means to permit parties to waive statutory claims. *See United States v. Mezzanatto*, 513 U.S. 196, 200–01 (1995). And a waiver presumptively requires the government to have "known" of this defense and to have "intentional[ly]" given it up. *Walker*, 134 F.4th at 440 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). When the government validly waives a claim, moreover, courts typically lack discretion to consider the claim anyway. *See Wood v. Milyard*, 566 U.S. 463, 466 (2012).

What, by comparison, does the law require for the government to *forfeit* this claim?  The Supreme Court has defined forfeiture as "the failure" to "timely assert[]" a claim.  *Walker*, 134 F.4th at 440 (quoting *Olano*, 507 U.S. at 733).  And a party's timeliness generally depends on the court practices that identify when the party must assert the claim.  If, for example, a party raises an issue for the first time on appeal, the party has violated our custom requiring them to exhaust the claim in the district court.  *See Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011 (6th Cir. 2022).  Although we can still review forfeited claims, we do so under the deferential plain-error standard in criminal cases.  *See United States v. Dale*, 156 F.4th 757, 764 (6th Cir. 2025).

Liggins offers two reasons why the government waived (or at least forfeited) its argument that he was not an "aggrieved person" under Title III.  He suggests that the government should have raised this argument in the first round of litigation, including during the first appeal to our court.  And he suggests that the government should have raised the argument in its initial response to his motion to suppress during the second round.  We will consider each argument in turn.

*First Round of Litigation*.  All agree that the government did not raise this aggrieved-person argument at all in the first round of litigation.  Liggins suggests that the government's "express decision" to "self-suppress" the intercepted communications during the first trial waived any argument that he lacked standing to challenge the legality of the interceptions.  Appellant's Br. 10.  But we need not consider whether this oversight qualified as a waiver or forfeiture.  Rather, we interpret our earlier mandate in the first appeal as reopening all issues for a fresh round of proceedings before a new judge.

When we resolve an appeal, we issue a "mandate" that the lower court must follow. *United States v. O'Dell*, 320 F.3d 674, 679 (6th Cir. 2003); *see Dale*, 156 F.4th at 766.  And our "mandate rule" can limit what the district court may consider on remand in "two" situations. *O'Dell*, 320 F.3d at 679.  The first limit turns on the nature of the remand: Was it a "limited" remand or a "general" one?  If we issue a "limited remand," we command the district court to consider *only* the specific issue we identify—not all issues.  *Id.*; *see, e.g., United States v. Schumaker*, 83 F.4th 1031, 1036 (6th Cir. 2023); *United States v. Moore*, 131 F.3d 595, 599–600

(6th Cir. 1997). If, by contrast, we issue a "general remand," the parties have greater flexibility to address all issues, including unaddressed ones. *United States v. Pembrook*, 79 F.4th 720, 727–28 (6th Cir. 2023); *see United States v. McFalls*, 675 F.3d 599, 604 (6th Cir. 2012). And when our opinion leaves the matter unclear, we presume that we issued a general remand. *See McFalls*, 675 F.3d at 604.

The second limit turns on the "inaction" of "one of the parties": Should the party have raised the issue in the first appeal? *O'Dell*, 320 F.3d at 679; *see United States v. Gibbs*, 626 F.3d 344, 351 (6th Cir. 2010). Suppose a party loses on an issue (call it "Issue A") in the district court. Suppose further that the party does not take a cross-appeal on Issue A when the other side appeals something else. Suppose lastly that we reverse based on the other side's appeal. If the district court on remand resolves Issue A in the same way, may the party appeal that issue after the second final judgment? Our cases sometimes say "no" because the party should have appealed Issue A from the first final judgment. *See Pembrook*, 79 F.4th at 729–37 (discussing *United States v. McKinley*, 227 F.3d 716, 718–19 (6th Cir. 2000), and *United States v. Adesida*, 129 F.3d 846, 849–50 (6th Cir. 1997)). We have interchangeably called this limit "appellate forfeiture," "waiver," or "law of the case." *See id.* at 729, 733; *O'Dell*, 320 F.3d at 679; *Gibbs*, 626 F.3d at 351; *McFalls*, 675 F.3d at 606.

Neither limit barred the government from challenging Liggins's aggrieved-person status on remand. To start, we issued a general (not a limited) remand in the first appeal. *See Liggins*, 76 F.4th at 509. The remand contained no "limiting language" and did not "outline" a narrow issue for the district court to resolve. *Schumaker*, 83 F.4th at 1036 (citations omitted). To the contrary, we "wipe[d] the slate clean" by holding that the prior judge should have recused and that a new judge should reconsider all issues. *McFalls*, 675 F.3d at 606. And that reconsideration could cover issues that the parties had "previously waived or forfeited." *Pembrook*, 79 F.4th at 729. Indeed, this general remand helped *both* sides because Liggins faced a serious preservation issue of his own. The government argued in the prior appeal that he did not timely raise this Title III issue until after the jury had convicted him. On remand, however, his potential forfeiture did not bar him from filing a proper pretrial motion to suppress. In short,

our general remand reopened all issues because we held that a new judge should handle this case from scratch.

Nor did our so-called appellate-forfeiture rule bar the government's claim. Admittedly, if the district court had found that Liggins qualified as an aggrieved person before the first trial and if the government had not challenged that decision in the first appeal, this doctrine might apply. *See id.* at 731–32. But the district court issued no such ruling in the first round of litigation. Besides, it ruled for the government on this aggrieved-person issue in the second round. Because the government sits on the appellee side of the "v." in this second appeal, "the appellate-forfeiture doctrine does not apply" to the claim. *Id.* at 733.

One last thing. The remand principles that we follow here arise mostly in the resentencing context. That is, a defendant appealed his sentence, we remanded, and the defendant appealed his new sentence. *See, e.g., id.* at 724–25; *McFalls*, 675 F.3d at 602–03. In this case, by contrast, Liggins's appeals challenged his convictions—not his sentences. Even so, Liggins does not argue that the governing remand principles should apply differently across the two contexts. So we may assume without deciding that the same principles apply in both.

*Second Round of Litigation*. All also agree that the government did not raise the aggrieved-person issue in its initial response to Liggins's motion to suppress on remand. Rather, the government first raised the issue in a supplemental response after the new judge flagged it during an unrelated hearing. Should this conduct have qualified as a waiver or forfeiture?

We begin with the easy answer: the government did not waive anything. It did nothing to suggest that it knew of this aggrieved-person argument and intentionally abandoned it. *See Olano*, 507 U.S. at 733. It never "expressly" relinquished the argument and never conceded that Liggins qualified as an aggrieved person. *Russell*, 26 F.4th at 375 (citation omitted); *see United States v. Mabee*, 765 F.3d 666, 673 (6th Cir. 2014). Nor did it raise and then withdraw this claim. *See United States v. Denkins*, 367 F.3d 537, 543–44 (6th Cir. 2004). The government instead passively failed to raise the argument until the district court mentioned it. And no evidence suggests that the prosecution's counsel had previously learned of this defense and opted not to raise it before that time. *Cf. Walker*, 134 F.4th at 445–46. If anything, the government's

decision to file a supplemental brief shortly after the district court flagged the issue shows that it acted with (at most) "neglect," which typically results in a forfeiture, not a waiver. *Bannister*, 49 F.4th at 1011–12.

This analysis leaves forfeiture. That doctrine applies when a party fails to "timely" raise an issue. *See Olano*, 507 U.S. at 733. So the doctrine requires us to identify the *time* that the government should have raised this aggrieved-person issue. That timing question depends on the district court's rules for processing claims. And here, the district court held that the government "raised" Liggins's aggrieved-person status "in a timely manner" by filing a supplemental brief ahead of the suppression hearing. Tr., R.187, PageID 2508. We see no basis to disagree with its conclusion. In fact, we normally refuse to find forfeiture when a district court "addresse[s] the merits of the issue"—no matter how the winning party brought the issue to the district court's attention. *See United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011); *see also Dale*, 156 F.4th at 765–66. And Liggins has identified no prejudice from the way that the government raised this argument. As the district court found, he had a "full opportunity" to litigate this issue. Tr., R.187, PageID 2508. The government thus did not forfeit anything either.

The cases on which Liggins relies do not change things. He first compares his case to *Russell*. There, the district court raised the defendant's lack of Fourth Amendment standing on its own without briefing from the parties. *See Russell*, 26 F.4th at 373–75. We held that the government forfeited (but did not waive) its standing argument, so we allowed it to raise that argument for the first time on appeal under the plain-error standard of review. *Id.* at 376. So *Russell* at least shows that the government did not waive its standing argument here. And *Russell* does not compel a forfeiture finding in this case because, unlike in that one, the parties timely and fully briefed the issue in the district court. *See id.* at 375. Nor does this case resemble *United States v. Noble*, 762 F.3d 509 (6th Cir. 2014). In *Noble*, we found that the government had waived Fourth Amendment standing by failing to raise it in its opening brief on appeal. *Id.* at 528. The government did not commit the same mistake in this case. So it has adequately preserved the issue for our review.

B. Merits

Under Title III, an "aggrieved person" "may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that" (among other things) "the communication was unlawfully intercepted[.]" 18 U.S.C. § 2518(10)(a)(i). The key "communications" in this case (from which the Arizona police learned of Liggins) occurred on October 21 and 22, 2015, when Jiminez spoke with others about her plan to pick up luggage for Liggins at the airport. The district court held that Liggins did not qualify as an "aggrieved person" for these calls. We review its factual findings for clear error and its legal conclusions de novo. *See Russell*, 26 F.4th at 374. What about the mixed question whether the historical facts make a defendant an "aggrieved person"? Our cases from the Fourth Amendment standing context show that we review this question de novo. *See United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008); *see also United States v. Bourrage*, 138 F.4th 327, 338–39 (5th Cir. 2025); *United States v. Fisher*, 56 F.4th 673, 682 (9th Cir. 2022). And because the historical facts are all undisputed in this case, the case turns on this mixed question.

The statute defines "aggrieved person" as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed[.]" 18 U.S.C. § 2510(11). The circuit courts have split over the meaning of this definition. We will describe that split. But we need not choose between the competing legal approaches because Liggins would not qualify as an "aggrieved person" under any view.

1. *Circuit Approaches*. Courts have adopted different readings of the aggrieved-person definition. All agree that those who participate in an intercepted call fall within the definition because it covers "a person who was a party to any intercepted wire, oral, or electronic communication[.]" *Id.* The disagreement thus turns on the meaning of the definition's second clause, which reaches "a person against whom the interception was directed[.]" *Id.* Taking a "historical approach," some courts read this phrase to adopt only Fourth Amendment standing rules. Taking a "plain-text" approach, others interpret it to go beyond constitutional standing.

Start with the historical approach.  Before Congress enacted Title III, Federal Rule of Criminal Procedure 41(e) allowed a "person aggrieved by an unlawful search" to move "to suppress" evidence obtained from it.  Fed. R. Crim. P. 41(e) (1964).  The Supreme Court read the phrase "person aggrieved" in Rule 41(e) to cover only those who had Fourth Amendment standing.  *See Alderman v. United States*, 394 U.S. 165, 173 n.6 (1969).  This standing reached the "victim of a search" (that is, the "one against whom the search was directed") but not others who "claim[ed] prejudice only through the use of evidence gathered as a consequence of a search . . . directed at someone else."  *Jones v. United States*, 362 U.S. 257, 261 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980).  When applying this test to physical property, courts held that a person had Fourth Amendment standing only if the person "owned or possessed the seized property" or had a "substantial possessory interest in the premises searched."  *Id.*  And when applying the rule to phone communications shortly after Title III's passage, the Supreme Court held that Fourth Amendment standing existed for those who *either* engaged in the "conversations" *or* owned the "premises" at which the "conversations" occurred.  *Alderman*, 394 U.S. at 176.

This history led some circuit courts to interpret Title III's definition of "aggrieved person" (like the phrase "person aggrieved" in Rule 41(e)) to codify "the existing law of standing in wiretap cases."  *United States v. Scasino*, 513 F.2d 47, 50 (5th Cir. 1975).  They held that a person could not challenge a defective wiretap "unless his conversations were overheard or the conversations occurred on his premises."  *Id.*; *see United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991); *United States v. Cruz*, 594 F.2d 268, 273–74 (1st Cir. 1979); *but cf. Bourrage*, 138 F.4th at 338–40.  At oral argument, then, the government read the phrase "a person against whom the interception was directed" to reach only those who owned the premises (or the cellphones in today's world) from which the conversations occurred.  Oral Arg. 22:15–:50.  This view might find support in the interpretive principle that courts should presume that a phrase with an existing meaning (like "aggrieved person") continues to have that meaning when used in a new context.  *See* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947).  And the view might find support in dictum from *Alderman*.  There, the Court stated that Title III's aggrieved-person text extended no further than Fourth

Amendment standing—which again covered only those whose calls were intercepted or who owned the premises from which the calls occurred. *See Alderman*, 394 U.S. at 175–76 & n.9.

Turn to the plain-text approach. The ordinary meaning of the aggrieved-person definition might extend Title III beyond what *Alderman* adopted for Fourth Amendment standing. If a wiretap application identifies the "target of the [requested] surveillance," one might naturally call this target "a person against whom the interception was directed[.]" *United States v. Oliva*, 705 F.3d 390, 395 (9th Cir. 2012); 18 U.S.C. § 2510(11). Hasn't the government "focus[ed]" the interception "on opposing" this identified target? *Direct*, *Oxford English Dictionary* (Online ed. 2025); *see Webster's Third New Int'l Dictionary* 39, 640 (1967). Adopting this broader reading, other courts have conferred standing on investigatory "targets" even if these targets did not participate in the intercepted communication or own the property from which it occurred. *See Oliva*, 705 F.3d at 395; *United States v. Apple*, 915 F.2d 899, 905 (4th Cir. 1990); *United States v. Civella*, 648 F.2d 1167, 1171–72 (8th Cir. 1981); *United States v. Giraudo*, 225 F. Supp. 3d 1078, 1082–83 (N.D. Cal. 2016) (Breyer, J.). As the Ninth Circuit has suggested, this approach might cover those individuals who are "named" in the wiretap application or order. *Oliva*, 705 F.3d at 395; *see Civella*, 648 F.2d at 1172.

What does our own precedent say about this debate? We have hinted at each approach without resolving the issue. *See Asker*, 676 F. App'x at 454–55; *United States v. Cooper*, 868 F.2d 1505, 1509–10 (6th Cir. 1989). In *Cooper*, we held that a defendant established his standing to suppress only the conversations in which he "participated." 868 F.2d at 1510. But *Cooper* relied on *Alderman* alone for this conclusion. *See id.* at 1509–10. We did not cite the aggrieved-person definition in § 2510(11)—let alone attempt to interpret its text. *See id.* So we neither addressed nor rejected the broader "target" theory of standing. In *Asker*, the defendant argued that his participation in one intercepted call gave him standing to contest *all* the calls intercepted through the wiretap. 676 F. App'x at 455. We disagreed and held that he could challenge only the single call in which he participated. *Id.* In the process, we explained that the defendant was not one of the "eight 'Target Subjects'" that the wiretap application had listed. *Id.* One might read this additional analysis as (at least impliedly) approving the broader target theory of standing. In short, this issue remains open in our circuit.

2. *Analysis*.  Ultimately, we opt not to take a side on this legal question because it does not matter to the outcome.  Recall that Liggins challenges the interception of calls between Jiminez and her coconspirators on October 21 and 22, 2015, because these communications revealed Jiminez's plan to pick up a bag of money for Liggins at the Phoenix airport.  The undisputed facts show that Liggins does not qualify as an aggrieved person for these calls under any approach.  As for the historical approach, Liggins did not "participate[]" in the calls. *Scasino*, 513 F.2d at 50.  And Liggins points to no evidence suggesting that these calls took place "on his premises" or that they used his cellphones. *Alderman*, 394 U.S. at 176.  As for the plain-text approach, nothing in the wiretap application, order, or anything else suggested that Liggins was one of the "targets" of the police investigation. *Civella*, 648 F.2d at 1172.  The application, for example, did not "name[]" him or seek to intercept any of his phone communications. *Oliva*, 705 F.3d at 395.

Liggins's three counterarguments fail to persuade us otherwise. *First*, he argues that he qualifies as an aggrieved person because he participated in a later intercepted call on October 31—several days after the police confiscated the bag from Jiminez at the airport.  During this later call, Jiminez gave her cellphone to Liggins so that he could speak to the person on the other end.  The government does not dispute that Liggins could seek to suppress this call.  And Liggins argues that his standing to contest one call gives him standing to contest all calls.  His theory relies on two uses of the word "any" in Title III.  A person qualifies as "aggrieved" under the aggrieved-person definition if the "person . . . was a party to *any* intercepted wire, oral, or electronic communication[.]"  18 U.S.C. § 2510(11) (emphasis added).  And once a person becomes "aggrieved," the person can seek "to suppress the contents of *any* wire or oral communication intercepted" under Title III. *Id.* § 2518(10)(a)(i) (emphasis added).  This second "any" might suggest that an aggrieved person can move to suppress *all* intercepted communications—not just the *specific* one that makes the person aggrieved.  After all, "any" normally "has an expansive meaning" to reach "one or some indiscriminately of whatever kind." *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting *Webster's Third New Int'l Dictionary* 97 (1976)).

But this theory suffers from both textual and precedential problems. As a matter of precedent, we have already explained that our opinion in *Cooper* rejected the same reading. *See Asker*, 676 F. App'x at 455 (discussing *Cooper*, 868 F.2d at 1509–10). *Cooper* binds us here too.

As a matter of text, the meaning of "any" depends on the "context" in which Congress uses the word. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 123 (2018); *Nixon v. Mo. Mun. League*, 541 U.S. 125, 132–33 (2004); *see* James J. Brudney & Ethan J. Leib, *Any*, 49 B.Y.U. L. Rev. 465, 466–69 (2023). The Supreme Court has thus refused to read the word to the full extent of its breadth when a narrower reading better fits the statute. *See, e.g.*, *Home Depot U. S. A., Inc. v. Jackson*, 587 U.S. 435, 445–46 (2019); *Nat'l Ass'n of Mfrs.*, 583 U.S. at 123; *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994). And the statutory context in Title III "counteract[s] the effect" of this modifier's typically broad scope. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 220 n.4 (2008). To be clear, we read the word broadly in one sense: it clarifies that aggrieved parties may seek to suppress every "kind" of wire or oral communications. *See Gonzales*, 520 U.S. at 5 (citation omitted); *see* 18 U.S.C. § 2510(1), (2). But we read it narrowly in another: it gives those parties the right to challenge only the "particular" communications for which they count as aggrieved. *See United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 406 (1999).

This reading finds support in several textual clues. For starters, Title III grants a right to suppress a *particular* intercepted "communication" on a communication-by-communication basis—not *all* the communications that follow from a judge's general intercept order. *See* 18 U.S.C. § 2518(10)(a). If Liggins were correct that Congress meant to grant standing to contest all communications if a party has standing to challenge one of them, Congress would have more naturally allowed parties to challenge the general orders (including all communications intercepted under them). Congress's use of the phrase "aggrieved person" reinforces this point. *Id.* It suggests that the person has been *aggrieved*—that is, "deni[ed] of legal rights"—by the interception that the party challenges. *Aggrieved*, *Merriam-Webster* (Online ed. 2025); *cf. Sackett v. EPA*, 598 U.S. 651, 672 (2023). Lastly, Liggins's reading has no stopping point. Under his view, once a party can challenge one communication, the party apparently obtains the

right to challenge *all* communications ever intercepted under Title III. In sum, Liggins's use of Jiminez's phone on October 31 does not give him the right to suppress earlier communications under Title III.

*Second*, Liggins asserts that Jiminez mentioned his nickname ("Rondo") during the calls on October 21 and 22 and so he became a "party" to these "communications" as a result. This theory need not detain us long. A "party" to an activity takes part in the activity—whether as a "participant or accessory." *American Heritage Dictionary of the English Language* 957 (1st ed. 1969). So if a person says that a neighbor was a "party" to a conversation, the person conveys that the neighbor *took part* in the conversation (not that the neighbor was the *topic* of the conversation). Under Liggins's view, by contrast, if two individuals held, say, a debate about President Jefferson, Jefferson himself would become a "party" to the debate. As any English speaker would conclude, that notion conflicts with the word's ordinary meaning. Liggins thus was not a party to the communications on October 21 and 22 because he did not participate in them.

*Third*, Liggins invokes the broader target approach to standing and argues that he should qualify as a "target" of the wiretap application. Although the application did not mention Liggins expressly or by nickname, he points out that the officers' affidavit in support of the application sought to intercept the communications of "other co-conspirators yet unknown" and to identify "all organizational co-conspirators[.]" Aff., R.170-1, PageID 2031, 2034. He adds that he qualifies as one of Jiminez's "unknown" coconspirators and thus that the government "directed" the "interception" at him. *Id.*, PageID 2031; 18 U.S.C. § 2510(11).

We disagree. Based on those references alone, Liggins would not qualify as an aggrieved party even under the broader target theory of standing. The officers "directed" their requested "interception" against Jiminez and the specifically identified individuals in her broader "Drug Trafficking Organization." 18 U.S.C. § 2510(11); Aff., R.170-1, PageID 2034. It did not, by contrast, "focus" the interception "on opposing" Liggins—whose separate drug trafficking came up by happenstance. *Direct*, *Oxford English Dictionary*, *supra*. Unsurprisingly, then, no court has interpreted "target" standing as broadly as Liggins would. Rather, courts have permitted this

type of standing for those "named" in a wiretap application or order.  *Oliva*, 705 F.3d at 395; *see Bourrage*, 138 F.4th at 339.

Liggins responds that our conclusion would create an incentive for officers to refuse to list "known targets" out of concern that this listing would give them standing to move to suppress the interceptions.  Appellant's Br. 17.  But Title III itself requires an application and order to include "the identity of the person, if known, committing the offense and whose communications are to be intercepted[.]"  18 U.S.C. § 2518(1)(b), (4)(a).  A statutory incentive thus already exists to include this information in applications so as not to violate the law (and risk the suppression consequences that might ensue).  More importantly, Liggins identifies no evidence to suggest that the Arizona officers in this case were investigating him and intentionally excluded his name from the application.  We thus need not take a position on when (if ever) a nonnamed individual may qualify as a "target" and will save the proper response to this concern for a case that implicates it.

We affirm.